DECISION.
{¶ 1} Defendant-appellant Jerome Brown appeals his conviction and sentence for aggravated murder, murder, two counts of aggravated robbery and robbery. We affirm the guilty verdicts, but must remand for resentencing because the trial court failed to make the necessary findings on the record.
 I. A Car and a Murder {¶ 2} On the evening of September 16, 2001, two young men with a similar passion for cars crossed each other's path. The meeting would prove fatal.
 {¶ 3} In Cincinnati, Timothy Powell met his friend Jeremy Evans to wash Powell's car before going out for the evening. Powell owned a white Oldsmobile Cutlass with expensive gold rims. The pair washed the car, then met two other friends, Clayton Diamond and Damon Jenkins, at Club Ritz in Bond Hill.
 {¶ 4} Meanwhile in Dayton, Brown and a group of friends and acquaintances decided to caravan to Cincinnati to "hit a lick," meaning to steal a car. The group, with between six and eight members in three different cars, drove to Club Ritz to look for cars in the parking lot. Three of the young men were carrying guns — including Brown with his .40-caliber Glock.
 {¶ 5} Powell and his friends left the club around closing time. They drove separately back to a parking lot near Evans's apartment. Brown and his crew followed them. Powell and Evans talked in the parking lot for a while, and Evans noticed the three cars from Brown's group drive by.
 {¶ 6} When Evans started walking up to his apartment, he saw the same three cars pull up near Powell's car. Three men jumped out of the cars, guns pointed at Powell. Evans hid, fearing for his own safety. Powell attempted to escape, but Brown and the others shot at the car. Brown was standing on the driver's side, shooting directly at Powell. One of the bullets struck Powell in the back, fatally wounding him. The car came to rest when it hit a tree. Brown then got behind the wheel of Powell's car and drove off; some of Brown's cohorts followed Brown, some went in the other direction.
 {¶ 7} Evans rushed down to help Powell and called Jenkins and Diamond. Diamond saw Powell's Cutlass and followed it onto the freeway. He then relayed the information over a cellular phone to police who had responded to the scene of the shooting. He also read the officer the temporary-tag number from a Buick Regal that was traveling with Powell's Cutlass.
 {¶ 8} The Hamilton County Sheriff's Office sent a cruiser to follow the Regal. But the Regal took off, and the police chased it at speeds of over 100 miles per hour — finally ending when police used stop sticks. The police arrested Anthony Stephens and Douglas Pittman after they got out of the Regal.
 {¶ 9} Some time later, another officer was dispatched to investigate a disabled vehicle. The officer found Powell's Cutlass in a ditch, out of gas, and badly damaged. No driver or passengers were at the scene. The car was taken back to Cincinnati to an impound lot and was tested for prints. Because Powell and Evans had just cleaned the car the previous day, there were hardly any usable prints. But a palm print lifted from the driver's side mirror matched Brown's.
 {¶ 10} Another five members of the gang, including Brown, were ultimately arrested in connection with the robbery and murder. Brown was charged with aggravated murder, murder, two counts of aggravated robbery, and robbery — all with firearms specifications.
 {¶ 11} At trial, all six of Brown's codefendants testified that Brown was involved in the crime and was the one who had actually shot Powell. Several of the codefendants were spared life sentences for their cooperation in Brown's case.
 {¶ 12} For his defense, Brown presented an alibi from several family members. They all claimed that Brown had been at a family gathering that night and had been asleep in his father's, James Brown's, bed. (We refer to James Brown as "James" to avoid confusion with his son.) James testified that they had been watching football that day. Brown's brother and cousin also testified that Brown was there, playing basketball, eating, and sleeping. And Brown's mother, who was not at the family gathering, testified that she took Brown to a job interview early the next morning. Brown also presented the testimony of two inmates who claimed that they had heard some of the codefendants say that Brown had not been involved in the crimes at all.
 {¶ 13} But the jury did not believe Brown's alibi or the exculpatory testimony. They found him guilty of all five counts and all five firearm specifications. The trial court merged all the robbery charges together, and it also merged the two murder charges. It sentenced Brown to 13 years for the robberies (10 years, plus three for the firearm specification) and 20 years to life for the murder, to be served consecutively. Brown's total sentence was 33 years' to life imprisonment.
 {¶ 14} On appeal, Brown assigns five errors: (1) the trial court allowed inadmissible hearsay evidence; (2) his conviction was against the sufficiency of the evidence; (3) his conviction was against the manifest weight of the evidence; (4) his consecutive sentences violated theSixth Amendment to the United States Constitution; and (5) the trial court failed to set forth specific reasons for imposing consecutive sentences.
 II. Articles Never Admitted {¶ 15} In his first assignment of error, Brown claims that the trial erred by "allowing inadmissible hearsay into evidence." He asserts that the trial court permitted the state to introduce two Cincinnati Post
articles that explained that the National Football League had cancelled games on September 16, 2001, because of the September 11 tragedy at the World Trade Center and the Pentagon.
 {¶ 16} The state attempted to introduce these two articles in its rebuttal. In fact, this was all that the state tried to do in its rebuttal. It claimed that the articles rebutted James's testimony that he and Brown had been watching football that day. But the trial court denied the state's request for rebuttal and did not admit the two disputed exhibits. The trial court got it right the first time.
 {¶ 17} We therefore overrule Brown's first assignment of error.
 III. Sufficiency and Weight of the Evidence {¶ 18} We address Brown's second and third assignments together because they concern the sufficiency and the weight of the evidence. In reviewing a record for sufficiency, we must determine whether any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt, when viewing the evidence in the light most favorable to the prosecution.[1]
 {¶ 19} A review of the manifest weight of the evidence puts the appellate court in the role of a "thirteenth juror."[2] We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[3] "No judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the case."[4] And a new trial should be granted on the weight of the evidence only in exceptional cases.[5]
 {¶ 20} Six witnesses testified that Brown was the one who had shot Powell. Brown now points out that all six of these witnesses were codefendants who had received reduced sentences. He argues that their testimony was unreliable because their stories changed and conflicted to such a degree that reasonable doubt precluded a guilty verdict. But the codefendants' stories did not vary by much. All six witnesses agreed that Brown had jumped out of one of the cars, stood next to the driver's side door, and shot into the car. Brown was also identified as carrying the only weapon capable of firing the bullet that was later found in Powell's body.
 {¶ 21} Further, Brown's palm print was on the driver's side mirror of Powell's car. Brown contends that the state failed to prove a temporal link, claiming that his print could have been placed there any time prior to the shooting. But the record shows that there were hardly any prints anywhere on the car. And Powell and Evans had washed the car earlier that night. Further, the codefendants' unanimous testimony that Brown had driven Powell's car after shooting him was enough to create a temporal link between Brown's palm print and the time of the shooting.
 {¶ 22} Viewing the evidence in the light most favorable to the state, a rational trier of fact could have found Brown guilty. And we cannot say that the jury lost its way or created a manifest miscarriage of justice by finding Brown guilty.
 {¶ 23} We therefore overrule Brown's second and third assignments of error.
 IV. Consecutive Sentences {¶ 24} In his fourth assignment, Brown argues that the trial court imposed consecutive sentences in violation of the Sixth Amendment underBlakely v. Washington.[6] We recently held in State v. Montgomery thatBlakely does not apply to consecutive sentencing in Ohio.[7] We therefore overrule Brown's fourth assignment of error.
 {¶ 25} As long as the trial court made the necessary statutory findings, there is no problem with Brown's consecutive sentences. But the court did not make these findings. In his fifth assignment, Brown argues that the trial court improperly imposed consecutive sentences because it failed to state its reasons for the sentences on the record.
 {¶ 26} A trial court may require the offender to serve prison terms consecutively if the court finds that (1) the consecutive sentences are necessary to protect the public from future crime or to punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) one or more of the following applies: (a) the offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing or under community control; (b) at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct; or (c) the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.[8] These findings must be stated on the record.[9]
 {¶ 27} The trial court did not state that the consecutive sentences were necessary to protect the public. It did not state that the sentences were not disproportionate to the seriousness of the offenses or to the danger that Brown presented to the public. And it did not make any of the other necessary findings.
 {¶ 28} The state argues that the trial court stated a rationale for the consecutive sentences when it said, "Brown committed one of the most cold-hearted, most calculated, one of the most overwhelmingly bad and wrongful acts imaginable." The state also claims that the trial court's description of the offenses constituted a statement that the consecutive sentences were not disproportionate to the seriousness of the offenses.
 {¶ 29} The trial court passionately described its distaste for Brown's crimes, stating that he "corralled [Powell] like an animal with no retreat" and pointing out what a compassionate, innocent man Powell had been. But this alone did not satisfy the trial court's duty to state the necessary findings on the record.
 {¶ 30} The state cites our decision in State v. Monford for the proposition that a trial court's failure to articulate the statutory findings can be waived if a defendant can demonstrate no prejudice.[10]
But Monford concerned a case where the defendant specifically requested the exact sentence that he received, so there was no prejudice to Monford. Brown made no similar requests. Monford is not analogous to the present case.
 {¶ 31} We therefore sustain Brown's fifth assignment of error.
 {¶ 32} Accordingly, we affirm the trial court's judgment in part, vacate Brown's consecutive sentences, and remand for resentencing in accordance with this decision.
Judgment affirmed in part, sentence vacated, and cause remanded.
Doan, P.J, and Sundermann, J., concur.
[1] State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492.
[2] State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541.
[3] State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.
[4] Section 3(B)(3), Article IV, Ohio Constitution.
[5] State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, citing State v. Martin (1983), 20 Ohio App.3d 172, 485 N.E.2d 717.
[6] (2004), ___ U.S. ___, 124 S.Ct. 2531.
[7] See State v. Montgomery, 1st Dist. No. C-040190, 2005-Ohio ___.
[8] R.C. 2929.14(E)(4).
[9] State v. Comer, 99 Ohio St.3d 463, 2003-Ohio-4165, 793 N.E.2d 473.
[10] State v. Monford, 1st Dist. No. C-030606, 2004-Ohio-5616.